

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**LAREDO DIVISION**

ENTERED
01/23/2015

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 14-50122** |
| **DIONISIO  TORRES** | § | **CHAPTER  7** |
| | § | |
| Debtor(s). | § | **DAVID R. JONES** |

<u>**MEMORANDUM OPINION**</u>
**(Docket No. 37)**

During a hearing conducted by the Court on August 22, 2014 to consider a motion to dismiss this case, the Debtor testified that he received legal advice and prepared bankruptcy forms from an unknown person in California.  The Court subsequently received a copy of a letter from Christian Yates in Newport Beach, California addressed to the Debtor's mortgage lender [Docket No. 37].  Based on the content of the letter and the Debtor's testimony, the Court issued a show cause order on August 25, 2014 requiring Mr. Yates to appear before this Court and explain why his conduct did not (i) constitute the unauthorized practice of law; (ii) violate 11 U.S.C. § 110; and (iii) violate other applicable law.  Mr. Yates submitted a written response on September 29, 2014 denying any inappropriate conduct [Docket No. 44].

On October 17, 2014, the Court conducted an evidentiary hearing.  Mr. Yates appeared and testified under oath.  Mr. Yates also offered documentary evidence and argument in support of his legal position.  After considering the testimonial and documentary evidence presented, and for the reasons set forth below, the Court finds that Mr. Yates violated multiple laws of the State of Texas and the United States.  The Court will grant legal and equitable relief against Mr. Yates.  A separate order consistent with this opinion will issue.

<u>**Factual Background**</u>

Dionisio Torres filed a voluntary chapter 7 case on June 3, 2014 [Docket No. 1].  In his petition, Mr. Torres disclosed that he had filed two prior cases during 2013 (Case Nos. 13-50128 and 13-50032) [Docket No. 1].  In each of the two prior cases, Mr. Torres was represented by counsel licensed in Texas and the federal courts for the Southern District of Texas [Dockets for Case Nos. 13-50128 and 13-50032].  In the present case, Mr. Torres indicated on page 3 of his bankruptcy petition that he was not represented by an attorney [Docket No. 1].  Likewise, the portion of the petition designated for the disclosure of assistance from a non-attorney bankruptcy petition preparer is blank.

Mr. Torres filed each of his three bankruptcy cases to delay the foreclosure of a condominium located at 2110 Bermuda Drive, Unit No. 20, Laredo, Texas (the "Property") by Falcon International Bank ("Falcon") [Docket No. 14].  After receiving notice of the latest bankruptcy filing, Falcon filed a motion before the Court on June 16, 2014 seeking relief from the automatic stay and requesting authority to foreclose its security interest in the Property

[Docket No. 14].  In the motion, Falcon asserted that Mr. Torres' bankruptcy case was filed in bad faith, noting that it had scheduled a foreclosure sale of the Property on 11 prior occasions [Docket No. 14].

On July 22, 2014, Falcon filed a motion to dismiss Mr. Torres' bankruptcy case as having been filed in bad faith [Docket No. 21].  In the motion, Falcon requested that the bankruptcy case be dismissed with prejudice to re-filing for a period of eighteen months [Docket No. 21].  The chapter 7 trustee filed a statement of non-opposition on July 23, 2014 [Docket No. 24].  After reviewing the pleadings, the Court scheduled an evidentiary hearing for August 8, 2014 to consider the motion [Unnumbered Docket Entry after No. 24].  On August 8, 2014, the parties requested additional time to prepare and the Court continued the hearing to August 22, 2014.

On August 21, 2014, Mr. Torres engaged counsel who filed a response to Falcon's motion to dismiss alleging the existence of changed circumstances that would allow him to convert his case to chapter 13 and propose a feasible repayment plan [Docket No. 30].

The Court conducted an evidentiary hearing on August 22, 2014.  Mr. Torres testified in support of his request that (i) the case not be dismissed; and (ii) he be allowed to continue under chapter 13.  During questioning by the Court, Mr. Torres testified that he filed this bankruptcy case on the advice of an unnamed person in California and that this unnamed person had prepared the bankruptcy petition and schedules for him.  The Court requested that any information regarding the identity of the unnamed person be provided immediately to the Court's case manager.

Shortly after the August 22, 2014 hearing, Falcon provided the Court's case manager with a copy of a letter it had received from "Christian H. Yates, MSA, Litigation & Bankruptcy Paralegal/Preparer" [Docket No. 37].  The letter states that Mr. Yates may be reached at 820 Irvine Avenue, T305, Newport Beach, CA 92663 [Docket No. 37].  Although sloppily written, the letter (i) makes demand on Falcon to take/forgo certain actions with respect to Mr. Torres' loan, (ii) provides statutory notice to Falcon under the Federal Fair Debt Collection Practices Act, (iii) instructs Falcon to take certain steps to avoid legal liability to Mr. Torres, and (iv) informs Falcon of its liability for failing to act in accordance with the letter's instructions [Docket No. 37].  The letter was written by Mr. Yates on Mr. Torres' behalf and sent to Falcon at its offices located at 5219 McPherson, Laredo, Texas [Docket No. 37].

On August 25, 2014, the Court entered its Order Setting Show Cause Hearing (the "Show Cause Order") requiring Mr. Yates to personally appear before the Court on September 19, 2014 and explain why his conduct (i) did not constitute the unauthorized practice of law; (ii) did not violate 11 U.S.C. § 110; and (iii) did not violate other applicable law [Docket No. 37].  Mr. Yates was instructed that telephonic appearances would not be permitted [Docket No. 37].  Mr. Yates was urged to retain counsel licensed to appear before the federal courts in the Southern District of Texas to represent his interests [Docket No. 37].  Mr. Yates was instructed to bring to the hearing "all materials related to his involvement with Mr. Torres or any family member of Mr. Torres, including all emails, letters, drafts of bankruptcy documents and payment records" [Docket No. 37].  Mr. Yates was advised that he could be subject to coercive and compensatory

sanctions and that if he failed to appear, a bench warrant could be issued for his arrest [Docket No. 37].

On September 2, 2014, Mr. Yates corresponded with the Court's case manager, Albert Alonzo, by email  [Docket No. 41].  In the email, Mr. Yates states as follows:

Albert: . . . I am respectfully requesting that the hearing be moved to the first week of October considering this is very short notice.  I will be out of town from 9/6 to 9/13.

[Docket No. 41].   Upon being alerted to Mr. Yates' request, the Court immediately entered an order rescheduling the hearing for October 17, 2014 and reminding Mr. Yates that all other provisions of the Show Cause Order remained in full force and effect [Docket No. 42].

On September 29, 2014, Mr. Yates filed his Answer and Motion to Appear Telephonical[l]y [Docket No. 44].  In his pleading, Mr. Yates makes the following statements:

Per my medical doctor, Sheldon R. Fayner I am medically unable to fly and I have enclosed a signed prescription including copies of medicine that is taken daily.

My status of employment with the Law Offices of Thomas D'Arco was terminated as a result of being "too" compliant in reference to acting as a full-time paralegal making compliance calls for the Law Offices of Thomas D'Arco. . . . The marketing department of the law firm referred Mr. Dionisio Torres to me to make a compliance call to determine suitability for any type of loan modification or bank work-out.  Based on the disclosed financial information from the debtor, it was not suitable to continue with any type of loan modification. Any type of real property discussions was done under my employment as an "in-house litigation and bankruptcy paralegal making compliance calls on behalf of the law firm only." . . . At no time did I ever collect any type of modification retainer or fee to modify any mortgage for the debtor. . . .  I viewed the pacer bankruptcy system and noticed the debtor filed bankruptcy several times to delay a sale date. I specifically told the debtor, "I am not an attorney and can't file a complete petition for you based on section 110 guidelines with regards to compensation." The debtor directed me to complete a bankruptcy petition that he was planning on possibly filing to continue with stopping a sale.  I explained to the debtor that I would not charge any compensation for the bankruptcy filing, therefore did not file a b19, b280 or did I sign the third page of the petition. . . .

. . . The debtor was provided with a Qualified Written request and he suggested that I send this to his lender.  I provided a clear and detailed service contract with my scope of services and the client signed the disclaimer stating at no time was I providing legal advice.  I organized documents and provided the client with a letter and audit(service).  The work was done in advance and the debtor paid me $1200.00[.] Document preparation was completed at the direction of the debtor.

> . . . Additionally, I am an independent senior bankruptcy paralegal with over 10
> years of experience.  I am familiar with 110 sanctions and was working at the
> direction of Thomas D'Arco, Esq. and my paralegal position was terminated with
> the firm on or about July 30, 2103 for being "too" compliant with customers. . . . I
> have filed other bankruptcy cases in Texas over the past 4 years and have not
> engaged in the unauthorized practice of law. . . .

[Docket No. 44].  The answer makes references to a number of exhibits. None of the referenced
exhibits accompanied Mr. Yates' answer.  Mr. Yates concludes his pleading with a request that
he be allowed to appear at the hearing telephonically as he could not "medically or financially
afford to fly to the hearing" [Docket No. 44].

By order entered October 6, 2014, the Court denied Mr. Yates' request to attend the
hearing by telephone [Docket No. 45].  In denying the request, the Court noted that it had
previously continued the hearing at Mr. Yates' request based on his statement that he [Yates]
"will be out of town from 9/6 to 9/13" [Docket No. 45].  The Court also verified that several
alternative means of transportation existed between California and Texas that would
accommodate Mr. Yates' stated medical condition [Docket No. 45].

On October 8, 2014, Mr. Yates filed an unsupported motion for a two-week continuance
to allow him the opportunity to retain counsel [Docket No. 48].  The Court denied the motion by
order entered October 9, 2014 noting that Mr. Yates was advised by the Court to retain counsel
in the August 25, 2014 show cause order [Docket No. 49].

At approximately 11:20 a.m. (Laredo time) on October 17, 2014, the Court commenced
the show cause hearing.  Mr. Yates was not present as required by the Court's September 2, 2014
order [Docket No. 42].  Mr. Yates subsequently arrived and the Court reconvened the hearing at
12:27 p.m. (Laredo time).   After brief statements, Mr. Yates was sworn and provided the
following testimony in response to questions from the United States Trustee:

Q      My questions are the standard questions that -- including state again for
       the Record if you would, Mr. Yates, your name, your address and your
       occupation?

A      Okay. Yes. My name is Christian Yates. I'm at 802 Irvine Avenue,
       Apartment T305 in Newport Beach, California. At the time the Debtor
       applied for the bankruptcy, I worked for the Law Office of Thomas
       D'Arco, so I was employed by a law firm, but I am an independent
       bankruptcy and litigation paralegal and preparer.

. . .

Q      When you were a paralegal for the law firm –

A      Yes.

4 / 25

Q      -- and you interview -- you interviewed Mr. Torres?

A      Yes. Let me elaborate, if I could? I would prepare bankruptcy petitions from time to time as I was directed to.

Q      Directed by whom?

A      Directed by Thomas D'Arco. It's not even licensed in the State of California. He's a practicing attorney in California, but he's not practicing in Texas.

Q      Okay.

A      And I would -- every client for approximately three months that I was employed there, I would speak with every client to determine suitability, as far as compliance, meaning were they suitable for a modification. This paperwork and all the documents was prepared in advance between various clients of the law firm through the marketing firm, which was separate from the law firm, in another office approximately about five miles away.  So the clients would sign a retainer with a sales person, a non-attorney, a non-paralegal, in another office and once those cases were brought in, they'd go to the various modification processors that were in the office that I worked out of and they would -- I would receive calls from them, as well as calls transferred on a daily basis, to determine compliance, so.

. . .

Q      And how were you paid? Were you paid directly by Mr. Torres?

A      I was paid by Mr. Torres to complete a loan audit that I sent to Falcon Bank and I completed this loan audit that's totally in compliance with the Texas State Bar and endorsed through the Certified Financial Loan Auditing Institute.

Q      Are you stating then that you had nothing to do with completing the Voluntary Petition that was actually filed in Mr. Torres' bankruptcy?

A      No. That's incorrect.  I prepare[d] Mr. Torres' Bankruptcy Petition at his direction, as well as the law firm, that wasn't even licensed in Texas. I talked to Mr. Torres from time to time, too, while I was employed at the law office. I looked at his previous cases filed and it was clear that there was a presumption of abuse. There was, I believe, over three cases filed in one year. So at that point it wasn't up to me to give him any legal advice. I was directed to stop the sale, which is what I called him about doing and

he agreed. He said, "Chris, I'd like to stop the sale date. I know I don't qualify for a modification because I'm with a private lender that doesn't get involved in modifications," and I just basically listened to him. But that -- I want to be specific. That case was brought in without my knowledge. I mean, these were clients that came to me to do compliance calls and I did what I was directed to do by Thomas D'Arco.

. . .

Q    I'm talking about filing the Voluntary Petition in the bankruptcy that requires the signature –

A    Yes.

Q    -- of a Bankruptcy Petition Preparer. You did not sign the Voluntary Petition as a Bankruptcy Petition Preparer; is that correct?

A    That is 100 percent correct and I didn't charge the client, but you're correct. I did not sign my name, which in hindsight I should have done, yes.

Q    And you did not provide a social security number either where the signature block requires that; is that correct?

A    That I'm not sure of. I'd have to look back on the Petition.

Q    To your knowledge, did you provide a social -- your social security?

A    My social security number?

Q    Your social?

A    No, I didn't. I didn't disclose that because I didn't charge the client. But you're correct. In hindsight, that was my mistake.

Q    Now when you say you did not charge the client –

A    I did not charge the client, let me clarify that. I did not charge the client to prepare the Bankruptcy Petition at all. I charged the client to prepare the loan audit that I sent to the bank.

Q    And so this was just a favor to the client because you had prepared some other legal document for him?

A I suppose you could call it that. It was more of just doing the right thing for the client. He was a client of the law firm, and I just went along with the program and was directed to do what I was told to do.

Q Now as you assisted the Debtor with completing these forms, so to speak, did you question the Debtor as to what his debts were?

A I did, and I took a lot of the information from a previous bankruptcy that he had filed and has given me updated information, some of which he told me verbally on the phone, but then other information that was readily available from the modification file that I had in the office.

. . .

Q Now when you say you received a fee, tell me exactly how much money did you receive and in what manner did you receive it? Was it a check directly to you or how did you receive that?

A It was a direct deposit from the client for the loan audit and it was deposited in my account, yes, which I supplied a copy of the check in my Answer.

Q And when you prepared this Voluntary Petition, in it you had in no way indicated that you received no fee, except to just leave it blank as far as have you received any?

A I left it blank, correct, because I didn't charge the client. In hindsight, I should have disclosed that whatever the amount was, it should have been under 150 and that wasn't charged and I didn't disclose it. I received zero dollars from the client, which is my mistake. I should have disclosed that.

Q Now you are not an attorney; is that correct?

A I am not. I did eight months of law school. I've been practicing bankruptcy and litigation, but no, I am not an attorney.

. . .

Q And you're not an attorney in Texas; is that correct?

A That's correct.

After considering Mr. Yates' responses, the Court questioned Mr. Yates about his (i) business activities; (ii) professional relationship with Mr. Torres; and (iii) compliance with the Court's Show Cause Order.  Mr. Yates provided the following responses:

THE COURT: Under what names have you or do you conduct business?

THE WITNESS: Christian Yates. There have been times when I've used Christian H. Yates, my middle initial. I have an LLC.

THE COURT: What's the LLC's name?

THE WITNESS: A-Apex Discount Commercial, LLC. And it's spelled A-A-P-E-X Discount Commercial, LLC.

THE COURT: Anything else? Have you ever gone by any other name?

THE WITNESS: No, I have not.

THE COURT: All right. You've looked at Exhibit 1. That's a copy of my Show Cause Order, correct?

THE WITNESS: Yes.

THE COURT: You got this in August, correct?

THE WITNESS: Yes, I did.

THE COURT: And you read it, correct?

THE WITNESS: I did, yes.

THE COURT: All right. You understood that you were supposed to personally appear at the hearing. You were notified of that in the original Order, correct?

THE WITNESS: Yes.

THE COURT: You were also told that no telephonic appearances would be permitted, correct?

THE WITNESS: Yes.

THE COURT: You were advised at that time to retain Counsel, correct?

THE WITNESS: Yes.

THE COURT: All right. You were also required to bring today everything in your possession related to Mr. Torres or any family member of Mr. Torres. Have you brought documents here today in response to my Order?

THE WITNESS: Yes. I have.

THE COURT: All right. Please produce them to me.
(Pause in the proceedings.)

THE COURT: All right. Mr. Yates, you've handed me a stack of documents. Is this everything that is responsive to the Show Cause Order that I entered?

THE WITNESS: Yes, it is, Your Honor.

THE COURT: All right. Now you said you were employed by the Law Offices of Tom D'Arco. When were you first employed?

THE WITNESS: It was approximately June 1st till approximately August 30th.

THE COURT: Of this year?

THE WITNESS: Yes. That's correct.

THE COURT: Were you hired pursuant to a written agreement?

THE WITNESS: I was, yes.

THE COURT: Do you have that agreement here today?

THE WITNESS: I do -- No, I do not have that agreement here today.

THE COURT: How were you paid?

THE WITNESS: I was paid a salary from Mr. D'Arco.

THE COURT: So taxes were deducted?

THE WITNESS: No, they were not.

THE COURT: So it wasn't a salary, was it?

THE WITNESS: I was paid as a contractor for the office on a --

THE COURT: So why did you tell me that you were paid a salary when, in fact, you weren't?

THE WITNESS: It was construed an agreement as a salary of $3,000.

THE COURT: Two people can agree to anything they want. It either is or it isn't and you know it's not a salary. Why did you tell me that?

THE WITNESS: I thought that that's what you wanted to know.

THE COURT: Or what you thought you had to tell me in order to avoid getting in trouble?

THE WITNESS: No, not at all.

THE COURT: So were taxes ever deducted from the payments that you received from the Law Office of Tom D'Arco?

THE WITNESS: No, they were not.

THE COURT: What were your stated job duties?

THE WITNESS: My stated job duties were to receive calls from clients.

THE COURT: Whose clients?

THE WITNESS: Mr. D'Arco's clients.

THE COURT: All right.

THE WITNESS: And determine suitability for a loan modification, as well as handle client complaints, when clients complained that they were receiving harassment calls from either their lender or their second mortgage lender, or other third parties that were involved in the debt being collected on the mortgage.

THE COURT: So you had no bankruptcy duties with respect to Mr. D'Arco's office?

THE WITNESS: I did and those duties were that if the case was taken and there was a sale date, my duty would be to try to stop the sale date so the modification could continue to be processed with the law firm and move on to the various stages of the modification.

THE COURT: So you were instructed to file bankruptcies solely to stop a foreclosure sale so that a loan modification process could continue?

THE WITNESS: That is correct, yes.

THE COURT: And you knowingly and voluntarily entered into that type of arrangement.

THE WITNESS: Yes. I did.

THE COURT: All right. There's a letter attached to the Exhibit 1. I want you to look at that, pages 2, 3, and 4 of Exhibit 1.

THE WITNESS: Yes.

THE COURT: It's a letter you prepared, correct?

THE WITNESS: This is a letter I prepared, correct.

THE COURT: It was sent to Falcon Bank in Laredo, Texas, correct?

THE WITNESS: Yes. That's correct.

THE COURT: Now you were acting as a litigation and bankruptcy paralegal/preparer, not as an employee of Mr. D'Arco in this letter; is that correct?

THE WITNESS: Yes. That's correct.

THE COURT: All right. And up at the top reads as follows. It says: "July 26, 2014, cease and desist from selling this property, the client is in an active bankruptcy." Correct?

THE WITNESS: Yes.

THE COURT: So at that time Mr. Torres was your client, correct?

THE WITNESS: Yes.

THE COURT: And in this letter, you make certain legal demands of Falcon International Bank; is that correct?

THE WITNESS: Yes.

THE COURT: You actually tell them that if they take certain actions, they will be violating certain statutes, correct?

THE WITNESS: Yes.

THE COURT: I want you to look at the last page. It says: "Also during this violation period, if any action is taken which could be considered detrimental to any of the client's credit reports, Mr. Vasquez may consult with Legal Counsel." Who is Mr. Vasquez?

THE WITNESS: He was a client from another case and I made a mistake and his name was inputted in the last page.

THE COURT: So you send these letters -- you send these letters out a lot, don't you?

THE WITNESS: No, I don't -- what would you -- no, not a lot. No.

THE COURT: How many times have you sent them to a bank with a Texas address?

THE WITNESS: Approximately -- I'd say approximately six to seven times. I don't know the exact number.

THE COURT: Do you have copies of all these letters?

THE WITNESS: I should, yes.

THE COURT: The letter goes on to read, it says: "If your office has failed to respond to this validation request within 30 days from the date of your receipt, all references to this account must be deleted and completely removed from my credit file and a copy of such deletion request shall be sent to me immediately." What does that mean?

THE WITNESS: Under the Credit Reporting Act, if the lender fails to respond, technically it needs to be removed and deleted.

THE COURT: From who?

THE WITNESS: It's under the –

THE COURT: It says your credit file. It says, "removed from my credit file."

THE WITNESS: I'm referring to Mr. Torres.

THE COURT: Why wouldn't you have said, "from Mr. Torres' credit file?"

THE WITNESS: It's something I should have said and I didn't. That was a mistake on my part.

THE COURT: You sent this -- you sent this letter on behalf of Mr. Torres requesting that a bank respond to it and take some action on behalf of your client, correct?

THE WITNESS: Yes.

THE COURT: All right. I want you to look at Exhibit 10. This is your agreement with Mr. Torres, correct?

THE WITNESS: It is, yes.

THE COURT: It's titled, "Trustee Verification Delay Service Contract." Did I read that correctly?

THE WITNESS: Yes.

THE COURT: And in this contract you agreed to provide: "Certain services including contacting, corresponding and communicating with the Trustee or Trustee Company, as well as obtaining, organizing, packaging and processing all information and documents necessary to achieve sale date postponement." Is that the scope of service that you agreed to provide?

THE WITNESS: Yes.

THE COURT: And for that you received $1200 plus $500 a month after the first three months, correct?

THE WITNESS: Yes.

THE COURT: And how much did you actually receive?

THE WITNESS: I only received $1200.

THE COURT: All right. And did you send the letter that's attached to Exhibit 1 as part of the services that you were providing under Exhibit 10?

THE WITNESS: To Falcon Bank?

THE COURT: Uh-huh.

THE WITNESS: No, I did not send Exhibit 10 to --

THE COURT: I didn't ask you that.

THE WITNESS: Okay.

THE COURT: I said: Did you sent the attachment to Exhibit 1 under the services that you agreed to provide in Exhibit 10? I never asked --

THE WITNESS: Yes.

THE COURT: -- if Exhibit 10 sent to anybody.

THE WITNESS: I sent it.

THE COURT: All right. So you entered into this contract --

THE WITNESS: Yes.

THE COURT: -- on or about July the 10th and then you sent the letter that's attached to Exhibit 1 on or about July 26th after being engaged -- after being retained by Mr. Torres to act on his behalf, correct?

THE WITNESS: Yes, approximately.

THE COURT: All right. And Exhibit 11, is actually a copy of the receipt of the deposit of the $1200 from Mr. Torres into your personal bank account, correct?

THE WITNESS: Yes.

THE COURT: Exhibit 12 is a document that you provided in the papers that you filed with this Court, which I assume you had signed -- well, let me ask you that: Did you, in fact, have Mr. Torres sign this document?

THE WITNESS: I believe I did, but didn't?

THE COURT: Why did you send me a blank one?

THE WITNESS: But I couldn't locate it, so it may not be signed. I wanted to be forthright with the Court.

THE COURT: So maybe you didn't even have authorization to act on behalf of Mr. Torres; is that what you're telling me?

THE WITNESS: It's possible, yes. I checked my records, but yes, it's possible.

THE COURT: Well are there any records that you have that aren't here pertaining to Mr. Torres?

THE WITNESS: Yes, there could be a signed contract that I have, that I --

THE COURT: So when you read my Show Cause Order where it said: "You will bring all materials related to your involvement with Mr. Torres or any family member of Mr. Torres, including all emails, letters, drafts of bankruptcy documents and payment records."  You're telling me that there may be some document that you didn't bring with you today?

THE WITNESS: Correct, but I didn't have and/or he didn't sign and send back to me.

THE COURT: That's not my question and you need to listen to me carefully. I want to tell you, you have pushed me to the very brink in what you have done. You've been about as disrespectful as anybody could be. You would do yourself a big favor by answering my questions and answering them honestly. Do you understand that?

THE WITNESS: Yes. I do.

THE COURT: I'm going to ask you one more time: Are there documents that you have that you have failed to bring with you today as you were instructed to do in the Show Cause Order?

THE WITNESS: Yes.

. . .

THE COURT: All right. I want you to look at Exhibit 13.

THE WITNESS: Okay.

THE COURT: It says, "Network attorney addresses."

THE WITNESS: Yes.

THE COURT: How did you get this document?

THE WITNESS: I obtained this from the associate attorney that was working, supervising activities at Thomas D'Arco and we were -- this was a list that I requested from the associate attorney.

THE COURT: What was the request that you made that resulted in your receiving this document?

THE WITNESS: While I was there, while I was working for Thomas D'Arco, I wanted a list myself to make sure that we were allowed to do modifications and if clients were properly -- had of counsel in the State of Texas, and I also requested that for the hearing because it had to do with Mr. Torres specifically.

THE COURT: So did you ever speak to Ms. Reed?

THE WITNESS: No. I called her twice and I have not spoke -- she has not called me and I haven't called her anymore.

THE COURT: So what was your understanding with respect to Ms. Reed's association with Mr. D'Arco?

THE WITNESS: My understanding was loosely that she was of counsel and received a -- I was told $75 a month for every client, specifically a modification client, that was brought into the Law Firm of Thomas D'Arco. And that's legally how it was supposed to be set up, according to management and as much as I know about it, to the best of my knowledge if anyone from Texas has to sign the retainer, there should be a retainer for a loan modification that's prepared by Ms. Reed, not Mr. D'Arco that's not licensed here, nor a marketing company that brought in a client.

THE COURT: How many clients did you work with Mr. D'Arco's office in the three months you were there?

THE WITNESS: I'm sorry. Can you repeat that?

THE COURT: How many clients did you work with from Mr. D'Arco's office during the three months that you were there?

THE WITNESS: As far as compliance, about total maybe about 350, approximately, over a three-month time frame. At times I received so many compliance calls and complaints that it could have been 400. I'm not exactly sure, but that's an approximate amount.

THE COURT: And how many of those were in Texas?

THE WITNESS: I would estimate there were at least 30 to 35 modification cases in Texas. There could have been more or less. I'm sure there were more before I came on board. In fact, I'm certain that there were before I came on board.

THE COURT: I want you to look at Exhibit 4 --

THE WITNESS: Okay.

THE COURT: -- which is your answer in the Motion to Appear Telephonically.

THE WITNESS: Yes.

THE COURT: All right. Your first sentence says, "I am responding to the Order to Show Cause Hearing and file a Response to any accusations of providing legal advice. Per my medical doctor, Sheldon Fainer (phonetic), I am medically unable to fly." But you flew here today, correct?

THE WITNESS: I did. Reluctantly, but I did, yes.

THE COURT: All right. And in fact you previously asked me for a continuance because you were on an out-of-town trip from September the 6th to September the 13th, correct?

THE WITNESS: Yes.

THE COURT: Where did you go?

THE WITNESS: I went to Maine to see my father that I haven't see in five years.

THE COURT: And how did you fly from -- or how did you get from California to Maine?

THE WITNESS: I flew and there were approximately four layovers.

THE COURT: All right. So when you asked me -- when you told me that you couldn't fly, you had taken a vacation and flown to get there, correct?

THE WITNESS: I did.

. . .

THE COURT: I want you to turn to page 2 of your Answer, beginning on line 13, you said: "The Debtor directed me to complete a Bankruptcy Petition that he was planning on possibly filing to continue with stopping a sale." I thought your testimony was that you were directed to prepare the documents by Mr. D'Arco's firm. Did I misunderstand that?

THE WITNESS: Yes. No, you didn't misunderstand it. That's what the firm did tell me to do.

THE COURT: But here you told me in your Answer that the Debtor told you to do it.

THE WITNESS: In addition to the law firm, the Debtor.

THE COURT: So both people told you to do it?

THE WITNESS: That's correct.

THE COURT: If that's correct, then why did you explain to the Debtor that you would not charge any compensation for the bankruptcy filing if it were a client of the law firm's and you were doing it at the direction of the law firm?

THE WITNESS: I did it as a favor, as good business for the law firm, and that's why I didn't charge the client for the bankruptcy.

THE COURT: Do you set the fees for Mr. D'Arco's law firm?

THE WITNESS: No, I do not.

THE COURT: All right. So why would you be telling him that you wouldn't be charging him a fee if the firm had told you to go ahead and do it? Why would you be involved in that at all?

THE WITNESS: Because Mr. Torres paid the law firm approximately $1300.

THE COURT: Why -- exactly. So why would you be telling him that you weren't charging him a fee to do something that you were told, by according to you, your employer to do already?

THE WITNESS: Because typically I do charge a fee that's reasonable under the guidelines and that's why I told him.

THE COURT: That you charge -- you individually charge?

THE WITNESS: Correct.

THE COURT: So you're working at Mr. D'Arco's firm and if you're told to do bankruptcy work, you charge a fee yourself?

THE WITNESS: I typically do, yes.

THE COURT: Okay. I want you to look at Exhibit 6, which is your request for a 14-day continuance. Have you got that in front of you?

THE WITNESS: I do, yes.

THE COURT: In line 25, you say: "The Court received my motion on September 30th and I only received the Court's answer on October 6th stating an appearance is mandatory."

THE WITNESS: Yes.

THE COURT: You knew that an appearance was mandatory when I entered the original Show Cause Order back in August, did you not?

THE WITNESS: Yes.

THE COURT: You also go on to say that you're: "Unable to afford a $550 ticket and have an unreasonable time from [sic] to locate reasonable representation." You were advised to hire a lawyer back in August, were you not?

THE WITNESS: I was, yes.

THE COURT: I want you to look at Exhibit 7.

THE WITNESS: Okay.

THE COURT: Explain this email to me, please.

THE WITNESS: This was an email that I sent that tried to elaborate that while I received an email from a processor by the name of Jacqueline Davis to myself on some other cases and it was directing that -- from Jacqueline that we couldn't work -- do a mod review and BK would be the only option. A new correspondent hasn't even received the full packet, so Jacqueline wanted me to reach out to the new correspondent informing him that we were not accepting files and that are less than 30 days from the sale date, thus a Trustee sale would typically appear and it would be -- it was asked of me -- I asked her, "How would you like me to handle it?"   So this was just another file that didn't have to do with Mr. Torres, but I wanted to show the Court that in my role from Mr. T. D'Arco dba Infinity Legal Group, and there were a few other dbas that he had, on what my role was and I tried to explain that in a separate email that wasn't related to Mr. Torres to the Court.

THE COURT: So essentially what you did is that you produced an internal legal communication for another client in a Court pleading unrelated to that client? Is that what you did?

THE WITNESS: Unrelated to the client? Yes, unrelated to Mr. Torres.

THE COURT: Yeah, so you just decided that you had the ability to waive attorney/client privilege on behalf of another client. Did you call Mr. and Ms. Muller (phonetic) and tell them that you were in trouble in Texas and you were going to include a copy of internal communications about their case to me? Did you tell them that?

THE WITNESS: No. This was an email that I had. No, I did not.

THE COURT: Now I want you to look at Exhibit 8.

THE WITNESS: Okay.

THE COURT: Would you tell me how you got this and why you have it?

THE WITNESS: This was a petition that I started preparing for Mr. Torres and I completed -- well Exhibit 8. The first page is completed. The second page I listed the Bankruptcy Court where previous cases were filed. And apparently somebody other than myself signed under an attorney.

THE COURT: Well you told me that it was Mr. Torres' signature, correct?

THE WITNESS: It appears to be his signature, yes.

THE COURT: No, you represented to me that it was Mr. Torres' signature, correct?

THE WITNESS: Yes, according to another signature I have, yes.

THE COURT: All right. And then Exhibit 9 is a letter from the US Trustee's Office directed to Mr. Torres.

THE WITNESS: Yes.

THE COURT: Why do you have that document?

THE WITNESS: It's something I printed off of PACER. I wanted to see some other things that it was involved in and bring to the Court's attention that –

THE COURT: Are you sure you're looking at Exhibit 9?

THE WITNESS: I believe I have the exhibit. It says, "US Department of Justice."

THE COURT: Yeah.

THE WITNESS: Exhibit 9.

THE COURT: Those letters aren't typically put on the Docket.

THE WITNESS: Okay. Well then I'm sure Mr. Torres sent me the letter with other information, so.

THE COURT: So you were deciding to make things up, just hoping that I'll be satisfied? You just told me under oath that "I got this off the Docket. I was looking at some other things." The fact of the matter is, you weren't, were you?

THE WITNESS: I did get things off the Docket, yes.

THE COURT: You didn't get this letter off the Docket.

THE WITNESS: Well then I must have received it from Mr. Torres, or I wouldn't have it.

The Court finds Mr. Yates' testimony to be disingenuous at best and intended to deceive the Court.  The Court further finds that Mr. Yates' testimony establishes multiple violations of the law.  Based on the evidence adduced at the hearing, the Court makes the following findings of fact and conclusions of law.

## Analysis

The Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334. This matter is a core proceeding under 28 U.S.C. § 157. The Court has constitutional authority to enter a final order in this case.

*Christian Yates is a Bankruptcy Petition Preparer Under 11 U.S.C. § 110.*

Sections 110(b)-(l) of the Bankruptcy Code govern the conduct of petition preparers in bankruptcy cases. Congress added § 110 to the Bankruptcy Code in 1994 in response to abuses by non-attorneys selling their "assistance services" to unwary debtors. *In re Rodriguez*, 2007 WL 593582 *2 n.1 (W.D. Tex. 2007). Section 110 of the Bankruptcy Code defines a "bankruptcy petition preparer" as "a person, other than an attorney for the debtor or an employee of such attorney under the direct supervision of such attorney, who prepares for compensation a document for filing." 11 U.S.C. § 110(a)(1). "A document for filing means a petition or any other document prepared for filing by a debtor in a United States bankruptcy court or a United States district court in connection with a case under this title." 11 U.S.C. § 110(a)(2).

Section 110 "proscribes virtually all conduct falling into the category of guidance or advice effectively restricting 'petition preparers' to rendering only scrivening/typing services." *In re Martinez*, 72 Fed. Appx. 138, 2003 WL 21849832, at *3 (5th Cir. 2003) (citing *In re Guttierez*, 248 B.R. 287, 297-98 (Bankr. W.D. Tex. 2000). Anything more, "be it suggesting bankruptcy as an available remedy for a debtor's financial problems, merely explaining how to fill out the schedules, or answering questions about exemptions or whether a claim is or is not secured will invariably contravene either state laws proscribing the unauthorized practice of law or other more specific provisions of § 110." *Id.*

Mr. Yates provided Mr. Torres with a completed voluntary petition, supporting forms, filing instructions, and strategic advice. In exchange, Mr. Torres agreed to pay Mr. Yates $1200 plus $500 a month after the first three months for these services. Mr. Yates testified that the foregoing compensation was given in exchange for unspecified "auditing services" and that his bankruptcy services were provided for free. The Court does not accept Mr. Yates' characterization of his relationship with Mr. Torres. The Court notes that "[v]arious petition preparers across the country have attempted to evade ... regulations [such as § 110] by characterizing their services as something other than bankruptcy petition preparation." *In re McCrary,* No. 12–56446, 2013 WL 2947902, at *4 (E.D. Mich. June 13, 2013) (citing *Ferm v. United States (In re Crowe),* 243 B.R. 43 (B.A.P. 9th Cir. 2000); *In re Landry*, 250 B.R. 441 (Bankr. M.D. Fla. 2000)). A court should focus on the substance of the preparation services rather than the title assigned by the preparer. *Id.* "[O]ffering to file a bankruptcy petition for someone paying for a different product is tantamount to serving as a petition preparer" for purposes of section § 110. *Bartok v. DeAngelis,* 2012 WL 664928, at *7 (D.N.J. 2012); *also see Ferm v. United States Trustee (In re Crowe),* 243 B.R. 43, 50 (B.A.P. 9th Cir. 2000).

The Court finds that Mr. Yates' testimony constitutes conclusive evidence that Mr. Yates knew his conduct was illegal and that he engaged in a concerted effort to conceal his conduct. Moreover, despite the contrived "employment" relationship with Mr. D'Arco, Mr. Yates' testimony reflects that in preparing the bankruptcy documents in this case, he was acting in a direct client relationship with Mr. Torres.   The Court finds that Mr. Yates is a bankruptcy petition preparer.

*Christian Yates Violated 11 U.S.C. § 110(b).*

Section 110(b)(1) of the Bankruptcy Code requires a petition preparer to sign and print his or her name and address on all documents they prepare which are submitted to the Court.   In addition, § 110(b)(2)(A) mandates that a petition preparer provide the debtor with a written notice before preparing bankruptcy documents or accepting a fee from the debtor.   This notice must disclose in "simple language that a bankruptcy petition preparer is not an attorney and may not practice law." 11 U.S.C. § 110(b)(2)(B)(i).   Further, the notice must be signed by both the debtor and the petition preparer.   11 U.S.C. § 110(b)(2)(B)(iii)(I).   The signed notice must be submitted with any documents that are filed with the court.   11 U.S.C. § 110(b)(2)(iii)(II).

Mr. Yates violated the provisions of 11 U.S.C. §§ 110(b)(1) and (b)(2).   First, Mr. Torres' bankruptcy petition is devoid of any reference to Mr. Yates' involvement in the case.   Second, it is undisputed that Mr. Yates never provided any written notice to Mr. Torres that he is not an attorney and could not practice law.   At best, Mr. Yates told Mr. Torres that he was not an attorney in a single conversation.   The Court finds this testimony suspect.   Even accepting Mr. Yates' testimony, the Court finds that Mr. Yates failed to comply with 11 U.S.C. § 110(b). Moreover, given the extent of Mr. Yates' efforts to camouflage his business activities, the Court finds the violation was intentional and made with the intent to deceive and to further a fraudulent scheme perpetrated by Mr. Yates.

*Christian Yates Violated 11 U.S.C. § 110(c).*

Section 110(c)(1) of the Bankruptcy Code requires a petition preparer to place "an identifying number that identifies individuals who prepared the document" on a document for filing.   This number must be the social security account number of the individual that prepared the document for filing.   11 U.S.C. § 110(c)(2)(A).   If the bankruptcy preparer is not an individual, the identifying number must be the social security account number of the officer, partner or other responsible person of the bankruptcy preparer.   11 U.S.C. § 110(c)(2)(B).

None of the documents that Mr. Yates prepared for Mr. Torres' bankruptcy filing reflect any information or identifying numbers for Mr. Yates, either individually or as the responsible person for one of his associated entities in accordance with § 110(c).   The Court therefore finds that Mr. Yates failed to comply with 11 U.S.C. § 110(c).   Moreover, the Court finds the violation was intentional and made with the intent to deceive and to further a fraudulent scheme perpetrated by Mr. Yates.

*Christian Yates Violated 11 U.S.C. § 110(e).*

Section 110(e)(2)(A) of the Bankruptcy Code prohibits a petition preparer from rendering legal advice. Section 110(e)(2)(B) sets forth a nonexclusive list of what constitutes legal advice for purposes of § 110(e)(2)(A). Included in this list is (i) whether to file a bankruptcy petition; (ii) whether a filing a bankruptcy case is appropriate; (iii) whether the debtor will be able to retain a home, car or other property; and (iv) advising the debtor on the procedures and rights of a debtor in bankruptcy. 11 U.S.C. § 110(e)(2)(B).

Mr. Yates provided Mr. Torres with the mechanics of how to misuse the Bankruptcy Code to stymie a secured lender's efforts to enforce its security interest in Mr. Torres' property. In connection with the bankruptcy filing, Mr. Yates drafted and sent a demand letter to a Texas financial institution asserting claims under federal law. Mr. Yates cannot hide the unauthorized practice of law in the rubric of "auditing services." Mr. Yates' actions in dealing with Mr. Torres and Falcon International Bank reflect a carefully crafted scheme designed to take advantage of a bankruptcy system created to protect to the honest members of our society that are facing difficult financial times. Mr. Yates sells a package of false hope and unattainable goals to the desperate. The Court concludes that Mr. Yates violated 11 U.S.C. § 110(e). Moreover, the Court finds the violation was intentional and made with the intent to deceive and to further a fraudulent scheme perpetrated by Mr. Yates.

*Christian Yates Violated 11 U.S.C. § 110(h).*

Section 110(h)(2) of the Bankruptcy Code requires a petition preparer to file a sworn declaration with a debtor's petition setting forth "any fee received from or on behalf of the debtor within 12 months immediately prior to the filing of the case and any unpaid fee charged to the debtor." No such declaration was ever filed in Mr. Torres' bankruptcy case. Mr. Yates violated 11 U.S.C. § 110(h). Moreover, the Court finds the violation was intentional and made with the intent to deceive and to further a fraudulent scheme perpetrated by Mr. Yates.

*Remedies*

Once the Court finds the existence of a violation by a petition preparer under § 110 or that a petition preparer has committed a fraudulent, unfair or deceptive act, it must order the petition preparer to pay to the Debtor the sum of (i) the debtor's actual damages; (ii) the greater of $2,000 or twice the amount paid by the debtor to the petition preparer; and (iii) reasonable attorney's fees. 11 U.S.C. § 110(i)(1). As set forth above, the Court has determined that Mr. Yates has committed multiple violations of 11 U.S.C. § 110. The Court has further determined that these violations were intentional and part of a fraudulent scheme to deceive. The Court therefore must order the payment of the amounts proscribed by 11 U.S.C. § 110(i).

In his testimony, Mr. Yates stated that he received $1,200 from Mr. Torres. This amount represents the minimum actual damages suffered by Mr. Torres as he received no measurable benefit from Mr. Yates' purported services. Added to the amount of actual damages is the sum of $2,400 under 11 U.S.C. § 110(i)(1)(B) for a total of $3,600.00. This amount shall be paid

within 14 days to the chapter 7 trustee.    The chapter 7 trustee shall file a certificate of compliance or seek additional relief within 21 days thereafter.

Mr. Torres has not requested nor proven the existence of any attorney's fees. Accordingly, none shall be awarded.

In addition, the Court may impose a fine against a petition preparer that fails to comply with any provision of 11 U.S.C. §§ 110(b), (c), (d), (e), (f), (g) or (h).  11 U.S.C. § 110(l).  The fine shall not exceed $500 per failure.  11 U.S.C. § 110(l)(1).  The Court must triple the fine in any case in which the Court finds that the petition preparer prepared documents for filing "in a manner that failed to disclose the identity of the bankruptcy petition preparer."   11 U.S.C. § 110(l)(2)(D).  Any fine that is imposed is to be paid to the United States Trustee in this district. 11 U.S.C. § 110(l)(4)(A).

The Court has identified a minimum of four violations of 11 U.S.C. § 110.  The Court finds that the maximum fine of $500 per violation should be imposed for each violation under the circumstances in this case.  *See In re Bradshaw*, 233 B.R. 315 (Bankr. D.N.J. 1999) (holding that a $500 fine was appropriate based on similar conduct by defendants and noting that numerous cases warranted the maximum fine on less egregious circumstances).   Having determined that Mr. Yates prepared or caused to be prepared documents for filing in Mr. Torres' bankruptcy case that failed to disclose his identity, the fine is tripled.  Accordingly, Mr. Yates is order to pay the sum of $6,000.00 (4 X $500.00 X 3) to the United States Trustee within 28 days. The United States Trustee shall file a certificate of compliance or seek additional relief within 21 days thereafter.

*Christian Yates has Engaged in the Unauthorized Practice of Law.*

The practice of law in Texas is restricted to members of the state bar, with limited exceptions permitted by the Texas Supreme Court.  TEX. GOV'T CODE § 81.102.  *In re Nolo Press/Folk Law, Inc.,* 991 S.W.2d 768 (Tex. 1999).  The practice of law means

> the preparation of a pleading or other document incident to an action or special proceeding or the management of the action or proceeding on behalf of a client before a judge in court as well as a service rendered out of court, including the giving of advice or the rendering of any service requiring the use of legal skill or knowledge, such as preparing a will, contract, or other instrument, the legal effect of which under the facts and conclusions involved must be carefully determined. [] The definition in this section is not exclusive and does not deprive the judicial branch of the power and authority under both this chapter and the adjudicated cases to determine whether other services and acts not enumerated may constitute the practice of law.

TEX. GOV'T CODE § 81.101.  The Court has the duty and the inherent power to determine in each case what constitutes the practice of the law, and to inhibit persons from engaging in the practice of law without having obtained a license to do so.  *Unauthorized Practice Committee, State Bar of Texas v. Cortez,* 692 S.W.2d 47, 51 (Tex. 1985).  In addition, Texas law provides that the

unauthorized practice of law is a Class A misdemeanor or, for multiple convictions, a third degree felony.  TEX. PENAL CODE § 38.123.

In this case, Mr. Yates engaged in a number of acts that constitute the authorized practice of law.  First, Mr. Yates provided bankruptcy and strategic advice aimed solely toward delaying a secured creditor from exercising its legal rights.  Second, Mr. Yates prepared bankruptcy documents for Mr. Torres' execution in order to implement the strategy.  Finally, Mr. Yates prepared and sent a demand letter to Falcon International Bank asserting legal claims on Mr. Torres' behalf.

Charlatans such as Mr. Yates weaken the very foundation of the best legal system in the world.  The Court has an obligation to protect the integrity of the legal process and insulate the unknowing and innocent from Mr. Yates' taint.  The Court finds that injunctive relief prohibiting Mr. Yates from engaging in similar future conduct and implementing sufficient monitoring of his future conduct is appropriate.

The Court directs the chapter 7 trustee to transmit a copy of this memorandum opinion and the accompanying order to the (i) Unauthorized Practice of Law Committee of the State of Texas appointed by the Texas Supreme Court; (ii) the Office of the California Attorney General; and (iii) the California Bar Association.  It is the Court's intent that this type of behavior can be stopped and the citizens of this country protected.

A separate order consistent with the foregoing will issue.

**SIGNED: January 23, 2015.**

**DAVID R. JONES**
**UNITED STATES BANKRUPTCY JUDGE**